[PHILADELPHIA, FEBRUARY 17, 1834.]

## The MECHANICS BANK of the City and County of Philadelphia *against* EARP.

### IN ERROR.

A bank in *Philadelphia* received on the fifth of *October*, 1826, from a mercantile house in the same place, one of the members of which was a director of the bank and conversant with its modes of doing business, two drafts, payable ten days after sight, upon two mercantile houses in *Virginia*, to be *transmitted* to a bank in *Virginia* for collection, with instructions as to the manner in which they were to be presented. The bills were drawn by the house which deposited them to their own order, and they endorsed them. They were also endorsed by the cashier of the bank, with a direction to pay them to the order of the cashier of the Bank of *Virginia*. The day after they were received, the cashier of the bank in *Philadelphia* enclosed them in a letter directed to the cashier of the Bank of *Virginia*, in which he stated that " the bills are enclosed for our account." When they were received by the bank in *Philadelphia*, they were entered in short in the bank book of the depositors. On the twenty-eighth of *October*, when a sufficient time had elapsed, according to common usage, the note clerk extended the bills in the books of the bank to the credit of the depositors, and a few days afterwards, at the request of the depositors, they were extended in *their* bank book. On the eighth or ninth of *April*, 1827, the depositors were apprised, for the first time, of the non-payment of the bills, and this fact came to the knowledge of the bank in *Philadelphia* about the twenty-sixth of the same month. The bank book of the depositors had in the meantime been settled seven times. One of the depositors was a stockholder in the bank in *Philadelphia*, and on offering to transfer his stock, permission to do so was refused on the part of the bank, under the eleventh article of the act of the twenty-fifth of *March*, 1820, which provides, that no stockholder indebted to the bank, for a debt actually due and unpaid, shall be authorized to transfer his stock or receive a dividend, until such debt is discharged or security to the satisfaction of the directors be given for the same. In consequence of this refusal, the stockholder brought suit against the bank, by whom no tender of the bills had been made to the firm : *Held*—

1st. That the bank in which the bills were deposited having received them for *transmission* only, had fulfilled its duty by sending them for collection, with the instructions of the depositors, to the Bank of *Virginia*, for whose laches it was not responsible.

2. That although the extension of the bills in the books of the bank, and the bank book of the depositors, was equivalent to payment, yet having been done under mutual mistake, the bank was not bound by it.

3. That the cashier having endorsed the bills, did not alter the legal relation of the parties, or add to the responsibility of the bank.

4. That the settlements of the depositers' bank book, did not alter the rights of either party.

5. That it was not necessary for the bank to tender the bills to the depositors.

6. That the bank had a right to refuse to permit a transfer of the stock of one of the firm, for a debt due from the partnership.

7. That the security for the alleged debt arising from the deposits of the firm, was not such as the bank was bound to take.

8. That even if the firm had a balance in bank more than sufficient to pay the amount of the bills at the time permission to transfer was refused, yet the bank was justifiable, under the circumstances of the case, in refusing to allow the transfer to be made.

It *seems*, that if the bank in *Philadelphia* had entered into a special agreement, or received a pecuniary reward for its services in *collecting* the bills, beyond a mere charge to cover expenses, and the Bank of *Virginia* was its *agent* for that purpose, it would have been responsible for the neglect of such agent, and an action might have been maintained for damages commensurate with the injury sustained in consequence of such neglect.

This suit was brought in the District Court for the City and County of *Philadelphia*, by the defendant in error, *Thomas Earp*, against the plaintiffs in error, the Mechanics Bank of the City and County of *Philadelphia*, and was removed into this court by writ of error.

On the trial in the court below, a great mass both of parol and documentary evidence was given, which was set forth in the bill of exceptions and returned with the record. But as all the facts which are essential to a perfect understanding of the points decided, are stated by the judge who delivered the opinion of the court, any other statement of them is deemed superfluous.

The cause was fully argued by *Bradford* and *Chauncey* for the plaintiffs in error, and by *Scott* and *J. Randall* for the defendant in error.

The opinion of the court was delivered by

Rogers, J.—In the month of *September*, 1825, *Earps & M'Main*, merchants, of the city of *Philadelphia*, sold to *Motley, Irvine & Co.* of *Perkinsville, Virginia*, and to *Irvine, Montagu & Motley* of *Lawrenceville, Virginia*, goods and merchandise, for which, when they rendered their accounts, the twentieth of *June*, 1826, there was a balance against the former house of four hundred and ten dollars and ninety-five cents, and against the latter of three hundred and fifty-two dollars and fifty-three cents. The accounts not being paid, *Earps & M'Main*, with a view to obtain payment, drew bills on the respective firms, dated the fifth of *October*, 1826, and payable ten days after sight, with this direction on the bills: " To be presented to *H. B. Montagu, Richmond, Virginia*, for acceptance. If he is not there, have it forwarded to *Irvine, Montagu & Motley, Lawrenceville.*" The bills being made payable to their own order, were endorsed by *Earps & M'Main*, and were also endorsed by *T. Fitch*, cashier of the Mechanics Bank, to pay to the order of *W. Dandridge*, esquire, the cashier of the Bank of *Virginia*. The notes were deposited in the Mechanics Bank, to be *transmitted* to their correspondent in *Virginia* for collection. The cashier of the bank, the day after they were received, enclosed them in a letter directed to *W. Dandridge*, cashier of the Bank of *Virginia*, in which he states, the bills are enclosed for our account. The bills, when received, were entered, as is usual, in short, in the bank book of *Earps & M'Main*. On the twenty-eighth of *October*, when a sufficient time had elapsed, according to the common usage of banks, the note clerk extended the bills on the books of the bank, to the credit of the depositors. Afterwards, perhaps on

(The Mechanics Bank *v.* Earp.)

the thirty-first of *October*, at the request of *Earps & M'Main*, they were extended on *their* bank book. Sometime about the eighth or ninth of *April*, 1827, *Earps & M'Main* received a letter dated the second of *April*, from *Montagu*, from which it appeared the bills had not been paid. This letter they answered on the twelfth, and in their answer express surprise at the contents of his letter, and inform him that they had received payment from the Mechanics Bank, in the manner before stated. It was, however, not until sometime about the twenty-sixth of *April*, 1827, that the Mechanics Bank appear to have been aware of the fate of the bills. Of that date they received a letter from the cashier of the Bank of *Virginia*, saying, that the two bills had been forwarded as directed: That it had escaped his recollection: That they had not been paid, and that it was probable they would not be paid: That he felt certain, 'that they would not be charged without advice of payment.' The cashier of the bank replied, that they had passed the amount to the credit of the depositors, and that the Bank of *Virginia* was liable. The defendants refused to permit *Thomas Earp*, of the firm of *Earps & M'Main*, to transfer his stock, and for this refusal this suit is brought.

The first question to which our attention was directed, is, what duty did the Mechanics Bank undertake to perform, in relation to these bills? And about this we have no difficulty. The undertaking clearly was, to transmit the bills, with the directions upon them, to their correspondent in *Virginia;* and on advice of payment, to credit the depositors with the proceeds, or pay over to them the amount. That this was the intention of both parties, is necessarily to be inferred from the nature of the transaction. The defendants did not undertake to collect the bills, but were used as the medium of communication between the depositors, and the collecting bank in *Virginia*. And this was so held in *Lawrence v. The Stonington Bank*, 6 *Con. R.* 528. The Eagle Bank, who in that case stood in the same situation as the Mechanics Bank do here, was considered merely as the instrument of transmission; and in the *Bank of Washington v. Tripplett & Neal*, 1 *Peters's S. C. Rep.* 25, (which so far as regards this point, cannot be distinguished from the present.) "The bill," says the Chief Justice, "was not delivered to the Mechanics Bank of *Alexandria* for collection, but for transmission to the bank in *Washington* to be collected. That bank would of course become the agent of the holder. By transmitting the bill as directed, the Mechanics Bank performed its duty, and the whole responsibility of collection, devolved on the bank which received the bill for that purpose. The Mechanics Bank was the mere channel through which *Tripplett & Neal* (who in this case were the depositors) transmitted the bill to the Bank of *Washington*." *Jackson v. The Union Bank*, 6 *Harris & John. R.* 148, goes on the same principles. In addition to the authorities, which are decided on the common and uniform usage of all banks, we are bound in this case to consider the defendants as an agent for transmission merely. The District Court placed the cause

on that ground, whereas, if it is contended that the Mechanics Bank, undertook to collect the bills, that was a material fact, which should have been passed upon by the jury.   It results from this state of the case, that the banks do not stand in the relation of principal and agent towards each other, but that the defendant was the agent for transmission of the bills, and their correspondent the agent for their collection.   It is obvious, that this view of the transaction dispenses with the necessity of inquiring, in what manner the agency of the latter bank has been performed ; for unless the duties of the defendants are more extensive than I have stated, it is clear, that although they are answerable for their own laches, they are not bound for the acts of omission or commission of their correspondent in *Virginia* ; and this, it must be remarked, was the opinion of the District Court. The learned judge placed the recovery of the plaintiff on the single ground, that the Mechanics Bank had not performed its duty ; had not done all the law required, and all that *Earps & M'Main* had a right to expect.   He delivered it as his opinion to the jury, " That the cashier of the Mechanics Bank, was guilty of negligence, in omitting to conduct and keep up a diligent and skilful correspondence with the Bank of *Virginia,* in relation to the bills : That the defendants undertook to transact the business, and were bound, with or without compensation, to do their part with fidelity, diligence and skill."   This want of legal diligence, I understand, consists in this :— It was the duty of the cashier (as the judge supposes,) finding that no intelligence came from their correspondent in *Virginia,* to have written to the cashier of that bank, and made inquiry as to the fate of the bills.   In examining the correctness of this position, it is necessary to recur to the acknowledged duties and liabilities of the defendants.   It is conceded, that they are not liable for the acts of their correspondent, and that their undertaking was to transmit the bills to the Bank of *Virginia* for collection ; and surely it cannot be imputed to them, that they were guilty of negligence in not forwarding the bills in due time.   No negligence or inattention has been charged to them in relation to that part of the transaction.   The material facts which bear on this part of the case are these.   *Thomas Earp,* the defendant in error and plaintiff in the action in the District Court, and one of the firm of *Earps & M'Main,* was a director of the Mechanics Bank, and was well-acquainted with the nature of their business.   He knew, that the course of that business was to transmit notes and bills abroad for collection ; and that in performing this friendly office for its customers no person ever supposed that it was taking upon itself any suretyship for its correspondent abroad : That this was a service ordinarily performed without compensation, and for this reason, that their duty was to transmit merely.   Messrs. *Earps & M'Main* were the creditors of firms located in *Virginia,* on debts which had been due for some time ; for one of these they held the note of the firm, which was also due.   As an experiment to obtain payment, they drew the bills in question, which they placed in

(The Mechanics Bank *v.* Earp.)

the Mechanics Bank, in the manner and for the object before stated. It was an attempt on their part to recover a debt, which was at least doubtful, by means of bills which they had no express authority to draw.  The bills were transmitted in due time; there was a short credit on the bank book of *Earps & M'Main,* and when the time arrived when they had a right to expect that if the drafts were unpaid, they would be informed of the fact, they were extended, according to usage, on the bank book of *Earps & M'Main.*  At that time, both parties had a right to believe that the money had been paid.  They did so believe, and acted under that supposition.  It is a case of mutual mistake, and in that view it is immaterial whether the extension be equivalent to payment or not, for where money is paid under a mistake of facts, it will not be denied that it may be recovered back.  Nor is it of any consequence, whether there was any special agreement to refund, as the law raises the promise to repay.  Until some time in *April,* none of the parties in interest were aware of the real state of things, nor had any thing occurred which would induce a suspicion of the fact of non-payment.  It is material to observe, that the banks to whom bills are transmitted for collection, do not advise their correspondents of the payment of the bills, although they invariably do of their dishonour.  This is the admitted practice.  When, therefore, nothing is heard from their correspondent, they have a right to believe they have been paid.  Of this course of business, Messrs. *Earps & M'Main,* the customers of the bank, were aware.  Why should the Mechanics Bank (as the Judge supposes was their duty) write to the Bank of *Virginia,* to know what had become of the bills ?  They supposed, as they had a right to do, that they had been paid.  In that belief, (which they held in common with the depositors,) in honesty and good faith, they paid the money, or, which is the same thing, extended the amount to their credit. No rule of commercial law has been shown, which obliges a bank to use greater diligence.  If the Mechanics Bank was mistaken, so were *Earps & M'Main.*  It was not the duty of the bank to write, because both parties believed, as they were warranted in believing, that the bills had been paid.  The law does not require from an agent any thing which is unreasonable, or unnecessary.  If then the bank is treated as an agent for transmission merely, I am at a loss to see, in what respect they have been guilty of negligence.  All the duty which the law exacts from an agent, has been performed with the requisite diligence, promptness and skill.  If they are to be considered as an agent, acting without compensation, they have a right to complain of the strictness of the rule applied to them at the trial. In strictness of speech, negligence is not permitted in any contract; but a less rigorous construction prevails in some cases than in others. The law considers diligence to be, in some sort, a relative term; and it must be judged from the nature of the bailment and all other ingredients which may fairly be presumed to enter into the contemplation of the parties.  He who asks a favour, has a right to expect to

be absolved from a proportionate care; and he who accepts a burthen, has a right to demand that he shall not be required to be as scrupulously exact as if he received a benefit.   *Story on Bailments,* 12.   *Jones on Bailments,* 8.

But, it is said, that the cashier having put his name on the bills, the legal relation of the parties has been changed: That by the endorsement, it became a foreign bill of exchange, and, as such, subject to the strict and arbitrary rules applied to such commercial paper.   This is viewing the transaction through the medium of form, without attending to its essence.   The office and undertaking of the bank, as has been before observed, are to transmit the bills, with the directions upon them, to their correspondent; and, on advice of payment, to pay over the proceeds.   *Thomas Earp,* who was a director, was aware of the nature of the undertaking, and that in performing for its customers this office, it did not become surety for their correspondent abroad; and that in endorsing the bill, they did not intend, as between the depositors and themselves, to assume any new liability, or impose upon themselves any other duty than to transmit the bills to their correspondent in *Virginia,* and to credit them with the proceeds when received: That this was the form in which such business is usually transacted, adopted with a view to effect the object which both had in view, and that the reason they were endorsed by the cashier was, to enable their correspondents to credit them with the amount, when received.

The deposit of a bill in one bank, to be transmitted to another, is a common usage, of great public convenience to the commercial world.   The mode pursued here, is believed to be common to all.   If therefore an endorsement has the effect contended for, it is a matter of great public concern, that it should be distinctly understood.   The consequence will be, either that the practice of transmitting bills will cease, to the great injury of commercial dealers, or that banks will charge for their services, in proportion to the increased risk to which they are exposed.   That the law has not been so understood, must, I think, be admitted; nor can I believe, that either the bank or Messrs. *Earps & M'Main,* supposed for one moment, that these bills were to be governed by the strict rules of the commercial law, as to foreign bills of exchange.   To enable the plaintiff to avail himself of the form, without the substance, would be to give the transaction an effect, not within the contemplation of either party.   It is certainly true, as is stated by Lord ELLENBOROUGH in *Leadbeater* v. *Farran,* 5 *M. & S.* 349, that if an agent sign only his own name, whether as drawer, endorser, or acceptor, he will (unless in the case of a government agent, contracting in its behalf,) be considered as the principal, and be personally liable as such, unless he add some restriction or qualifying words, as " *sans recours,*" or " without recourse to me," or " drawn or endorsed to transfer the interest only, and not to incur any personal liability ;" for it is an universal rule, that a man who puts his name to a bill, thereby makes himself liable, unless he states

(The Mechanics Bank *v.* Earp.)

on the face of the bill, that he subscribes it *for* another, or by *procuration* of another, which are words of exclusion. These principles have been carried to a great length in some recent English decisions. It has been held, that if a broker sell goods, and draw on the buyer in favour of the principal, he will be liable as drawer upon the bill if it be dishonoured, unless he use special words to prevent it, and may be sued, even *by his employer*, although he received no guarantee commission, or other remuneration, for incurring such personal responsibility. *Le Fevre* v. *Lloyd*, 5 *Taunt.* 749. And if a person be employed by the plaintiff to purchase bills for him, obtains them payable to himself, and endorses them generally, he will be liable upon the endorsement, even to *his own employer*, although he had no guarantee commission. The court observed in one case, that the brokers, by giving the bill put an end to all doubts as to the buyer's responsibility ; and in another case, that the defendant might have specially endorsed the bill "*sans recours*," and not having thought fit to do so, he was personally liable. So far as the decisions subject an agent to personal liability, as regards *third* persons, they do not admit of question ; and if the observations of Lord ELLENBOROUGH are taken with this qualification, they are without objection ; or if it be intended to put the cases cited upon the *special facts*, or to say, that at *law* they are liable to their employers, it is *unnecessary* to dispute their authority ; but if it is intended to decide, that the agent is liable to *his employer*, under such circumstances, and that equity would not grant relief, an examination into the propriety of the decision may give rise to a different opinion. As between the *employer and the agent*, it is without consideration ; and this is a ground of equitable relief. I cannot see the policy of applying the strict rules applicable to bills of exchange, to such a case. And I have no hesitation in saying, that in *Pennsylvania*, where we have no court of chancery, the agent would not be liable to his principal from the circumstance, merely, that he had endorsed the bill, without disclosing the fact of agency, by a special endorsement. *Chitty*, in the last edition of his *Treatise on Bills*, page 39, notices the cases referred to, and in respect to them holds this language: " It seems questionable, whether, *even at law*, it is correct to allow an *employer* to recover from an agent, under such circumstances, because in general between the original parties, it may be shown, as a good defence at law, the bill was drawn, accepted, or endorsed for the plaintiff's accommodation, or for a purpose or consideration which has failed, or been satisfied. *Ex parte Robinson*, 1 *Buck.* 113. And to allow such a *principal* to recover at law against his *agent*, is only to compel the latter to resort to a court of equity for relief ; for where an agent, in the course of his employment as such, procured a banker's bill, which was actually drawn in his favour, and endorsed by him to his employer, who deposited it with a banker, who gave credit for the amount, but was cognizant of the manner in which the bill had been endorsed, the Court of Exchequer restrained an action brought by

(The Mechanics Bank *v.* Earp.)

the banker on the bill against the agent as endorsor. *Kidson* v. *Dilworth*, 5 *Price*, 564. And where a person employed to get a bill discounted, being unable to effect it without endorsing it, therefore endorsed it in his own name, it was held, that he was entitled to be indemnified by his employer, though the latter's name was not on the bill, and a claim and proof under a commission of bankruptcy were allowed accordingly."

The court looks beyond the face of the bill. We regard substance, not form. In the case at the bar, as presented to us on the record, the only duty of the bank was to transmit the bill. It was neither accepted nor paid; and if any negligence has occurred, it is not to be imputed to the defendants, but to their correspondent, for whom they are not responsible.

It is urged, as a reason to prevent the reversal of the judgment, that there have been seven settlements between the parties, and it is true, that the bank book of *Earps & M'Main* has been settled seven times. But this is not such a settlement as can alter the rights of either party. The accounts are still open to examination and correction. There is no pretence to say, that either intended any such effect.

It has been contended, the bank should have tendered the bills to *Earps & M'Main* ; but, for what purpose, I do not understand. The debt, as between the original parties, remains unchanged. It would be no defence for them that these drafts were outstanding. As nothing was paid for it, it was neither an equitable nor legal assignment of the debt. The bank neither did, nor did intend, to become purchasers of the drafts. It remains now to notice an objection which has been pressed upon the attention of the court by the counsel for the defendant in error.

The eleventh article of the act of the twenty-fifth of *March*, 1820, provides, that no stockholder indebted to the bank for a debt actually due and unpaid, shall be authorized to make a transfer or receive a dividend, until such debt be discharged, or security to the satisfaction of the directors be given for the same. The objections are three. 1st. That the bank had no right to refuse a transfer of the stock of one of the firm for a debt due from the partnership. 2nd. That they had an ample security, arising from the deposits of the firm, for their debt,—and, 3rd. That the firm was not in debt to the bank, because the amount deposited to their credit was greater than the sum now in controversy. As to the first objection, we think, that as the separate property is liable for the debts of the firm, the act was intended to give the bank a lien not only on the joint stock, but also on the stock held by each member of the partnership. The directors had a right to choose between them. Of this Mr. *Earp* has no reason to complain. Nor do we think there is anything in the second objection. The bank had no lien on the deposits. It was for Mr. *Earp* to offer reasonable security. If reasonable security had been offered and refused, of which the jury would doubtless be the

(The Mechanics Bank *v.* Earp.)

judges, the plaintiffs would have had a right of action. But no such offer was made, for if it had been, we should not have been troubled with this case.

The third objection is grounded on the assumption of a fact denied by the other party, viz., that they had a balance in bank more than sufficient to pay the amount of these bills. If there was a doubt about the fact, it should have been submitted to the jury, with a direction from the court on the point of law. But as this case must go to another jury, the parties have a right to the opinion of this court, on the supposition that the fact is as stated by the counsel for the defendant in error. The question is, were *Earps & M'Main* at the time the bank refused to permit the transfer, indebted to the bank for a debt actually due and unpaid, within the meaning of the act of the twenty-fifth of *March*, 1824 ? The case supposes, that on a settlement of accounts, there was a balance in favour of the firm, allowing the bank credit on account of the bills : That instead of *Earps & M'Main's* being indebted to the bank, the bank was indebted to them : That the proper course was, not to refuse permission to transfer, but to withhold payment of so much of the deposits of the firm as was required to pay the amount of the bills improperly credited in account. If the bank had dishonoured the plaintiff's check, it would have been a much harsher proceeding than the course pursued. Still, the plaintiff may stand on his legal right. The point is not without difficulty, but I have come to the conclusion, that the bank were justifiable, under the circumstances of the case, in refusing to permit the transfer. If the firm had been indebted on a note discounted by the bank, they would have a lien on the stock, without regard to the amount of their deposits. It would be open to them to adopt one of two courses—either to have charged the amount of the note, or to have relied for their security on the lien which the act gives them. The extension on the books of the bank was equivalent to payment. These funds have been used as other deposits. It then becomes a debt, within the meaning of the act.

It cannot but be observed, that the basis of the opinion of the court, is, that the Mechanics Bank was an agent for the transmission of the bills : That their only duty was to forward the bills and credit the proceeds when received. If, however, on another trial, the jury should believe, under the direction of the court, that the parties entered into a special contract, different from the general usage, to collect the bills : That the Bank of *Virginia* was not alone their correspondent, but *agent* for that purpose, then a different case will be presented. In such an inquiry, the proof of the fact of such an engagement will lie on the plaintiff, and it will be material for him to show, that the bank received *compensation* for their services in *collecting the bills.* I say compensation for their services in collecting the bills, for a charge of one half or three quarters per cent. to cover expenses and difference of exchange, will not affect the question. If the undertaking of the bank was to *collect*, and not merely to *trans-*

(The Mechanics Bank *v.* Earp.)

*mit,* they would be answerable for their *Virginia* correspondent; and this I understand to be the principle of the case of *Van Wait* v. *Wooley, et al.* 3 *Barnwell & Cresswell,* 439, 10 *Com. Law Reps.* 145, so much relied on by the counsel of the defendant in error.   AB- BOT, Chief Justice, delivered the opinion of the court, and after stating the facts, proceeded as follows : " Upon this state of facts, it is evident that the defendants, (who cannot be distinguished from, but are answerable for their *London* correspondents, *Sir John Lubbart & Co.*) have been guilty of neglect of the duty which they owed to the plaintiff, their employer, *and from whom they received a pecuniary reward for their services.*   The plaintiff is therefore entitled to main- tain his action against them, to the extent of any damage he may have sustained by their neglect.   *Tweed* v. *The Bank of Utica,* 20 *Johns. R.* 372; and *Van Wait* v. *Smith & Holly,* 1 *Wend.* 219, are referred to for the same principle.   If the jury should be of the opin- ion, that the Mechanics Bank undertook to collect the money, then it will be necessary to inquire, whether the bank of *Virginia* has done its duty, and what is the extent of the liability of the defendants.   Until then, we think the expression of any opinion would be premature, except so far as to state, that the bank would be liable in damages only as any other agent to his principal, to the extent of the damage which may have been sustained by their neglect, as has been abun- dantly shown by the authorities cited at the bar.

Judgment reversed, and a *venire de novo* awarded.