[PHILADELPHIA, JANUARY 26TH, 1839.]

## BELLEMIRE *against* The BANK OF THE UNITED STATES.

### IN ERROR.

1. A bank which receives a note for collection, and when it is overdue places it in the hands of a notary in the usual course, is not liable for the neglect of the notary to give notice to an endorser.

2. A note had been deposited by the holder in a bank for collection. When it fell due and remained unpaid, it was placed, as usual, in the hands of the Bank's notary, whose clerk called at the store of G. the last endorser, to inquire for the place of residence of C., the first endorser. The wife of G., who was in the store, told the clerk that C. resided at a particular place, which was in fact the place of business of C.'s son. Notice was left at that place, and G. was informed of his wife's direction as to the place of residence of C. The note was renewed by agreement between the parties, and when it again fell due the notary's clerk again left notice at the place of business of C.'s son, supposing that it was the store of C.; by which mistake C. was discharged. *Held*, that neither the Bank, nor its agent, the notary, was liable to the holder of the note for the consequences of the omission to give notice to the endorser.

THIS was a writ of error to the District Court for the City and County of Philadelphia, to remove the record of an action on the case brought in that Court, by John B. Bellemire, against the President, Directors and Company of the Bank of the United States.

The declaration set forth that the plaintiff, being the holder of a promissory note, dated Philadelphia, September 7, 1832, drawn by Joseph N. Goodrich in favour of and endorsed by Jacob Coats, for $105 dollars, payable thirty days after date, deposited it with the defendants for the purpose of having its amount collected, and that it might be proceeded in according to law, and in case of non-payment by the drawer, that due notice might be promptly given to the endorser; averring that the defendants received the note and undertook to use all due diligence, care and attention, for the purpose of collecting it from the drawer and endorser, and in case it should not be paid at maturity by the drawer, undertook to give immediate notice to the endorser; averring also that on the 10th of October

1832 the note became due, and payment having been demanded of the drawer, by whom it was not paid, the defendants did not give or cause to be given *immediate* notice of non-payment to the endorser, but wholly neglected, &c., whereby the endorser was discharged, &c., and the amount wholly lost to the plaintiff, who was obliged to pay the costs of an unsuccessful action in this Court against the endorser.

The action was for the recovery of the amount of the note with interest, and the expenses of prosecuting the unsuccessful action against the endorser.

On the trial before JONES, J. on the 15th of October, 1835, the plaintiff examined as witnesses Jacob Coats, Abraham Coats, Leonard Englebert, and George Sharswood, Esq. The defendants read the depositions of Harriet Gouiran and Michael Gouiran, and examined James S. Farmer. Upon the testimony it appeared that the note in question was one given in renewal of a former note for the same amount, drawn and endorsed by the same parties, dated July 6, 1832, which, being payable sixty days after date, fell due on the day of the date of the note in question. Jacob Coats the endorser, was a justice of the peace, who lived in Third street near Tammany street. Joseph N. Goodrich, the drawer, was a tenant of his, who gave him the former note for the amount of certain rent for which he had been pressing him. Mr. Jacob Coats gave the note to his son, Abraham Coats of the firm of Coats & Moore, jewellers, on the south side of Chesnut street, the first door above Sixth street, in order that the son might dispose of it. Abraham Coats sold it to Leonard Englebert, a broker, who bought it as agent for the plaintiff, Bellemire. Mr. Englebert handed the note to Michael Gouiran, a jeweller in Chesnut street near Fourth street, who, as a friend of Mr. Englebert, received it for the purpose of depositing it in bank for collection. Mr. Gouiran kept an account in the Bank of Pennsylvania, and one in the Bank of the United States. He endorsed this first note and deposited it for collection in the Bank of Pennsylvania. On its maturity, not being paid within bank hours, the note was handed in the usual manner to the notary of the bank. The clerk of the notary presented it for payment at the store of the drawer, and was informed that he was out and had left no directions for its payment. The clerk, not knowing the endorser Coats, or his place of residence, called at the store of Michael Gouiran, the last endorser, by whom the note had been deposited in the bank. He there found Mrs. Gouiran, the wife of Mr. Gouiran, who was in the habit of attending his store. He handed her the notice of non-payment, directed to her husband, and inquired of her for the address of Mr. Coats, or where to leave the notice for Mr. Coats. (It did not appear whether or not he mentioned the first name of Mr. Coats.) She

replied, " In Chesnut street the first door above Sixth." The clerk went to the place thus designated, and seeing the name of Coats & Moore, went in and left the notice with a boy in the store, desiring him to hand it to Mr. Coats.

On the same evening, Mr. Gouiran received the notice which had been left with his wife. Before that, she had told him that the notary's clerk had been there and had asked for Mr. Coats, and that she had directed him to the corner of Sixth and Chesnut streets. He was aware that the notary's visit had reference to this note, and was at the same time aware that the name on the note was the name of the elder Mr. Coats, the father of the young man at the corner of Sixth and Chesnut streets. After this, Mr. Gouiran took the original note out of the Bank of Pennsylvania. It was renewed by the parties, who gave the note now in question in lieu of it. The same broker Mr. Englebert, procured this second note from the drawer, got the elder Mr. Coats's endorsement of it, and took it to Mr. Gouiran, requesting him to deposit it in bank for collection, as before. Mr. Gouiran did so, except that in this instance he deposited it in the Bank of the United States, instead of in the Bank of Pennsylvania. On the day of its maturity it laid over ; and after bank hours, was handed in the usual manner to the notary, who happened to be the same person who was notary of the Bank of Pennsylvania. The note in question was handed to the same clerk to whom the former note had been delivered. Nobody had ever remonstrated with him as to the former notice, or the place of leaving it. When he received the note in question from the Bank of the United States, the same course was pursued with it as had been pursued with respect to the former note except that there was no repetition of the inquiry which had been made of Mrs. Gouiran in respect to the former one. After demand of and non-payment by the drawer, the notice of non-payment was left as before at the store of Mr. Gouiran with Mrs. Gouiran, and at Coats & Moore's in Chesnut street above Sixth. No remonstrance or objection was afterwards made either to the notary or his clerk, to the Bank of the United States or its officers. The day after the note fell due, it was taken out of bank by Mr. Gouiran, who, a day or two after it fell due, handed it to Mr. Englebert, who, on the next day or the day after, called on Mr. Coats the father, who refused to pay it on the ground of not having received due notice of non-payment, but stated that there was a distress on the goods of the drawer, and if it produced money enough to pay the whole rent, including the amount of the note in question, the note should be paid out of the proceeds. The distress did not produce enough to pay the rent accrued after the rent for which the note was given. The drawer being insolvent, the present plaintiff sued the endorser Jacob Coats, and obtained an award of arbitrators for the amount of the note with interest. The defendant appealed, and upon the trial in Court obtained a verdict in his favour,

which the Court refused to set aside, and upon which final judgment was afterwards entered for the defendant, who recovered his costs from the plaintiff. The witnesses, Mr. and Mrs. Gouiran, were not examined in the case against Coats. The plaintiff never gave to the Bank of the United States any notice of the institution or pendency of his suit against Coats, of which it did not appear that they had any knowledge, until the 16th of April, 1834, which was some time after its final termination.

In the course of the trial of the present case, it appeared that the Philadelphia Directory for the year 1831, contained the name and residence of Jacob Coats, justice of the peace, the endorser of the note in question, but did not contain the name or address of his son Abraham Coats of the house of Coats & Moore, at whose store the notices were left as above mentioned.

James S. Farmer, notary's clerk, in his cross-examination, testified as follows:

"When we receive a note for protest, and do not know where one of the parties lives, we inquire of the last endorser, because we always suppose he can give the best direction. *  *  *  *  *  *  *  *  *  *  *  Our first inquiry always is from the last endorser ; and when he does not know where a party lives, we look into the Directory. I do not look into the Directory when I know positively where a party lives, or am directed positively where to leave the notice. Had Mrs. Gouiran told me she did not know where Mr. Coats resided, I would have inquired elsewhere, or would have looked into the Directory. The Directory cannot be depended upon."

Being re-examined, he said—

"An interleaved Directory at the Bank of the United States is full of manuscript corrections. I have acted eighteen years as the clerk of the notary. Nobody but myself acted during the whole of that time in serving notices; except perhaps for a day or two when I was sick."

The witness added: "When we are directed to a particular place, we ascertain, by the direction, if the party lives there." *  *  *  *  *  *  *  "According to the practice and usage of the business, the name of Coats & Moore, above the door was a sufficient identification of the Mr. Coats to whom I was directed."

He also testified, that notices in the city are never sealed. The notices left at Mr. Gouiran's, and at Coats & Moore's, were partly written and party printed, and were closed, but not sealed.

The Court charged the jury as follows:

"It would seem that Mr. Gouiran acted gratuitously, as an agent

(Bellemire *v.* Bank United States.)

to collect this note, and so did the Bank of the United States. The bank knew nobody but Gouiran. There is no evidence that either the bank or Gouiran received any compensation. It was probably otherwise with Englebert, who was a broker. In the absence of testimony on this head, we must take the agency to have been gratuitous both as to the bank and as to Mr. Gouiran.

If you believe that Gouiran, knowing all that had taken place in respect to the delivery of notice as to the second note now in question, did, on the day after its maturity, take it out of the bank without any objection, I think that the plaintiff ought not to recover. The bank was authorised to take the directions of Gouiran, whom alone they knew as the holder of the note ; and if he neglected to correct the error, but on the contrary, with knowledge of what had occurred, took it out of bank without objection, these facts would furnish a defence to the charge of negligence.

But there is another position on which the defence takes stronger ground.

If the bank undertook the collection of this note gratuitously, I think that they complied with their duty in delivering it to the notary to do what was usual in such cases. The defendants are not his sureties, and he, and not they, would be liable, if there were any negligence. In such cases, the agency of a notary is necessary, or at all events is proper. A certain number of notaries only are commissioned, and if they were all incompetent as officers, still the bank would have to choose among them. The notary is a public officer, who gives an official bond with sureties. He is not here, it is true, a judicial officer. On the other hand he is not perhaps, strictly or precisely speaking, in all respects a ministerial officer. His duties in some matters are more easily to be defined than in others. This matter of giving notices of the non-payment of dishonoured notes, certainly falls within the scope of his official duties, and he receives a compensation for his services in performing them. I have come to the conclusion, that if there was any neglect as to giving or not giving notice, the notary, and not the bank, is the party liable."

The plaintiff excepted to this charge, but the jury found a verdict for the plaintiff, and a motion for a new trial was made in the Court below, and argued under an agreement that if the Court should be of opinion that the charge was correct in point of law, the verdict was to be set aside and a verdict to be entered for the defendants, with liberty to the plaintiff to except, &c., as if the jury had found a verdict in conformity with the charge.

The District Court, after argument, ordered judgment to be entered for the defendants (*) ; and the plaintiff sued out this writ of

* 1 *Miles's Rep.* 173, (*Bellemire* v. *Bank U. S.*)

(Bellemire *v.* Bank United States.)

error; and on the return of the record assigned the following errors:—

" 1. Because the Court below erred in charging the jury, that in the absence of testimony, the agency of the bank must be taken to be gratuitous.

2. Because the Court below erred in charging the jury that the defendants complied with their duty in delivering the note to the notary to do what was usual, and that if there was any neglect as to giving or not giving notice, the notary, and not the bank, was the party liable.

3. General errors."

Mr. *Gilpin*, for the plaintiff in error.

The defence to the plaintiff's claim in the District Court was two-fold.

1. It was alleged that the bank was not responsible for the acts or negligence of the notary; he being a public officer. This is denied on the part of the plaintiff. 1st, Because the agency of a notary public is not necessary to collect notes, or charge endorsers. *Nicholls* v. *Webb*, (8 *Wheat.* 331). 2nd. Because the duty performed by a notary in relation to promissory notes is neither strictly nor exclusively an official act. Act of 5th March, 1791, § 4; *Jacob's Law Dict.* tit. *Notary Public. Morgan* v. *Van Duzen*, (2 *Johns. Rep.* 204.) *Nicholls* v. *Webb*, (8 *Wheat.* 331.) *Browne* v. *Philadelphia Bank*, (6 *Serg. & Rawle*, 487.) Allowing, therefore, that the employment of a notary public to perform an act strictly and exclusively official, would exempt the bank from liability, shall such employment, when unnecessary, relieve the bank from the pervading principle, that an agent is responsible for the acts or negligence of his sub-agent? The doctrine of responsibility is especially applicable when the notary public is *pro hac vice* the adopted agent of the bank, and divested of his official dignity. *Bank* v. *Porter*, (2 *Watts*, 141.) Where the protest of a notary is strictly official, his duty does not extend to notice of protest.

2. It was contended, that the employment of an agent of known fidelity exempted the defendants from all responsibility. The principle, if allowed here, would be extended to every special agency, and the consequence would be the irresponsibility of corporations, since they do every act by the agency of their officers; and in many cases there would be a wrong without a remedy, since a sub-agent is generally not liable for non-feasance. 12 *Mod.* 488. *Cameron* v. *Reynolds*, (*Cowper*, 403.) In the cases that have heretofore arisen in relation to the liability of banks, the question has been, whether the undertaking was to transmit or to collect; if the latter,

(Bellemire *v.* Bank United States.)

all the cases consider the agent liable for the act or negligence of the sub-agent. *Essex Bank* v. *Foster*, (19 *Mass. Rep.* 479.) *Van Wart* v. *Smith*, (1 *Wendell*, 219.) *Bank of Washington* v. *Triplett*, (1 *Peters's S. C. Rep.* 25.) *Mechanics' Bank* v. *Earp*, (4 *Rawle*, 286.) *Smedes* v. *Utica Bank*, (20 *Johns.* 372.) *Bank of Utica* v. *M'Kinster*, (11 *Wendell*, 473.)

Mr. *W. Fisher* and Mr. *Cadwalader*, for the defendants in error.

The bank was a gratuitous agent and liable only for gross negligence. No compensation is ever charged or received for the collection of notes and bills. The mere charge of a commission to cover difference of exchange, or expenses of transmission or collection, does not deprive the agency of the character of a gratuitous agency. It was so held in *The Mechanics' Bank* v. *Earp*. The bank did its duty by delivering the note into the hand of a public notary, in pursuance of universal custom. *Brown* v. *Philadelphia Bank*, (6 *Serg. & Rawle*, 486.) In *The Mechanics' Bank* v. *Earp*, this Court say, that it is material for the plaintiff to show, that the bank received *compensation* for its services in collecting the bills. 6 *Conn. Rep.* 528. All the Courts take notice of the usages of banks. The agency admitted of delegation in this case because it was gratuitous and necessary in the ordinary course of business; and because it is sanctioned by usage. *Bank of Utica* v. *Smith*, (18 *Johns.* 239.) *Smedes* v. *Bank of Utica*, (20 *Johns.* 393.) It was in evidence in this case, that the real plaintiff assented to the employment of the notary. The notary is an officer of the commonwealth, not of the bank. By the act of 1791 only a limited number can be appointed, and they give security. By the act of 1815, their certificates of official acts are made evidence. The consequences of the doctrine contended for, on the part of the plaintiff, would be very serious to the community.

Mr. *Sharswood*, in reply.

If the banks do not receive compensation for the collection of notes and bills, they enjoy some consideration at least, in the deposit of the money, which always remains with them for some time. *Smedes* v. *Utica Bank*, (20 *Johns.* 381.) (6 *Cowen*, 662.) A notary may, for certain purposes, be a public officer, as in matters arising under the law of nations, but in respect to the serving of notices, as in this case, he cannot be considered in any other light than as a private agent. Bills of exchange and promissory notes differ materially in respect to protest. Giving notice is no part of the duty of protesting. The act of 1815, relative to certificates by notaries, does not enlarge their duties. In the by-laws of some of the banks, the notary is treated as their officer. In the cases which have been cited, the duty was to be performed by the bank at a distance. *Cochrane* v. *Fairlamb*, (2 *Maule & Selw.* 301.)

(Bellemire *v.* Bank United States.)

It is the custom to employ a constable to make a distress for rent, yet the landlord is liable for his acts, though he is a public officer. *Bussy* v. *Donaldson,* (4 *Dall.* 206.)

The opinion of the Court was delivered by

GIBSON, C. J.—It has been ruled by this Court, in conformity to precedents cited in *The Mechanics' Bank* v. *Earp,* that a bank employed to transmit for collection, is bound to concern itself with the act of transmission alone; and that its correspondent becomes the agent for subsequent measures. It is suggested, however, that a bank which has undertaken the whole business of collection, may be affected by other considerations; but though it be the holder by endorsement, there is nothing peculiar in its position. It is invested with the apparent ownership only to authorise it to present for payment; and standing, in all other respects on the ordinary footing of an agent, it is sufficient to exonerate it that it has acted in good faith and, though not to the best advantage, according to the regular and accustomed course of the business. Thus in *Russel* v. *Hankey,* (6 *T. R.* 12,) a banker who had given up bills endorsed to him for collection, on receiving the acceptor's check which was subsequently dishonoured, was not charged with negligence because the transaction was not an unusual one. The principle was carried out in circumstances less like the present, in *Smith* v. *Cadogan,* (2 *T. R.* 188,) *Pitt* v. *Yalden,* (2 *Burr.* 2061,) and *Moore* v. *Mourgue,* (*Cowp.* 480.) Now a bank is compelled by the incorporeal nature of its essence, to act by the instrumentality of agents; and when it employs its own servant, with the usual instructions, it performs its implied promise to use ordinary diligence. I lay the servant's official character out of the case. The bank was bound to commit the business to a competent hand; and it is not alleged that the notary was not such. Had the plaintiff desired to have the services of a special agent, it would have been his business to furnish one. Omitting to do so, he consented to let the matter take its course; and the bank performed its duty by committing it to the person employed in its own concerns. Nor do I agree that a bank is answerable for the act of an instrument, which is not a part of its organic machinery, any more than a transmitting bank is answerable for the act of its correspondent. Though a hired agent is not only bound to a high degree of diligence in his own person, but, as was held in *Lord North's case,* (2 *Dy.* 161,) responsible as a surety for those whom he chooses to employ; the agency in this instance, being purely gratuitous, is subject to a different rule. What the bank undertook to do, was to put the note into the ordinary channel of collection; and it performed its undertaking when, for the purposes of presentation and notice, it put it into the hands of its own notary. Nor does there seem to have been any default even in him. Though the

gratuitous acceptance of an agency is a consideration for an implied undertaking against misfeasance, it requires a valuable consideration to support an action for nonfeasance. It appears, however, from *Elsey* v. *Gatewood*, (5 *T. R.* 148,) that an omission to finish a business gratuitously begun, is a positive misfeasance: still the responsibility of an unpaid agent is so far inferior in degree, that he is not bound for ordinary skill, nor liable for any thing less than gross negligence. This is distinctly asserted in the *Charitable Corporation* v. *Sutton*, (2 *Atk.* 406,) and *Coggs* v. *Bernard*, (2 *Ld. Raym.* 909,) but more emphatically in *Shiells* v. *Blackburne*, (1 *H. B.* 161,) where a merchant who had entered, for exportation, the goods of his correspondent together with his own, but both parcels by a wrong denomination, was not held 'liable for the seizure which ensued, because he had received no reward, and was not of a profession, as it was said, which implied the possession of peculiar skill. But it seems from the same case, that though actual mistake be excusable, it will be treated as wilful where there has been a want of application of skill actually or presumptively possessed. Were the action against the notary, it might be said that as a hired servant, he was bound to use the utmost diligence; but even he would be excused if it appeared that, in the absence of specific instructions, he had pursued the usual course. Though generally, if not universally employed on such occasions, the official character of a notary extends only to the protest, and not to the hunting up of the parties. Neither he, nor the bank, is bound to know any one in the transaction, but the last endorser. He is the agent of the creditor, if not the creditor himself; and he is the person to answer inquiries as well as to give directions. Now the facts here, are, that the notary's clerk, having ineffectually presented the precursor of the present note for payment, and wishing to learn the place of the first endorser's residence, called to inquire about it at the store of the last endorser, whose wife, in his absence, gave a wrong direction, in pursuance of which the notice was left at the store of the first endorser's son. Did the matter rest even there, no one would be answerable for it: the husband, however, who had, in the course of the same evening, been informed of his wife's misdirection, did not think proper to correct it, but suffered the clerk, who relied on the accuracy of the former transaction which had passed without objection or dispute, to repeat the error when the note which replaced the former one, and which is the subject of the present controversy, came to be protested. Who was to blame for that? Though bound to know the residence of the parties, the depositor and apparent owner was unable or indisposed to furnish the proper information; and his own misfeasance was consequently the cause of the loss. A notary, though bound to possess a competent share of skill, is not bound to know the residence of those on whom he is to call. Directions in respect to it, ought to be left at the bank, or, at the very least, the

(Bellemire *v.* Bank United States.)

depositing endorser ought to be, at all times, prepared to give full and precise information in respect to it. But whatever might be the remedy against the notary, it is clear that to the bank which acted gratuitously and according to the usual practice, there is no recourse.

Judgment affirmed.