## TITUS & SCUDDER v. THE MECHANICS' NATIONAL BANK AT TRENTON.

1. It is not necessary, before suit brought, to demand money deposited with a bank by check, or to demand that it be handed over in bills or specie. The object of requiring a demand on banks before suit for deposits is, that when they are ready and willing to pay on demand, they shall not be annoyed by a suit. The implied contract is, that the bank shall keep the deposit until called for; and until the bank refuse to pay on demand, they are not in default.

2. Evidence from which the jury might have inferred that the checks were received as cash, should have been submitted to them.

3. The consideration set forth and proved, that the plaintiffs were dealing in the bank, and kept their deposits there, and gave these checks

upon New York, by which the defendants had the advantage of the rate of exchange, in the greater value of funds in New York than in Trenton, is a sufficient consideration for the contract set forth in the special counts of the declaration in this case.

4. A dealer who deposits a draft on a distant city in a bank in his own town, has no choice of their agent or correspondent; it is the business of a bank to provide proper agents or correspondents for this service, when they adopt it, as most banks do, as part of their regular business.

This cause was brought up from the Supreme Court by writ of error. It was brought on for trial before the Mercer Circuit. Upon the evidence for the plaintiffs being closed, the circuit judge ordered that the plaintiffs be non-suited. To this, a bill of exceptions was taken, and the judgment of non-suit entered on that order is now sought to be reversed.

The material facts of the case as collected from the bill of exceptions, appear in the opinion of the court.

*E. T. Green* and *James Wilson,* for the plaintiffs in error, presented the following points :

1. The checks in question were deposited in the Mechanics' National Bank, and by them received as such, and credited as such, to Titus & Scudder.

2. The bank assumed the responsibility of collecting the said checks, and are, therefore, responsible for any neglect of duty on their own part, or of any of the agents employed in such collection.

3. The law imposes the duty upon the bank receiving these checks for collection, to cause the same to be presented for payment to the payer ; and if payment be refused, to cause proper protests to be made, and notices of such protests sent to those who, by law, are entitled to receive them. The evidence in this cause shows a failure both to present and to protest the checks in question. For such failure of duty, an action lies against the bank.

4. Upon the facts as proved in this cause, the justice erred in directing the plaintiffs to be non-suited.

*J. R. Emery* and *H. S. Little*, for the defendants, presented the following points:

1. The action being brought by plaintiffs in error against the defendants in error, for money had and received by the defendants, as bankers, to the use of the plaintiffs, and also for breach of a special contract, in relation to the presentment of two checks, and no evidence being offered below sufficient to charge the defendants upon either of these demands, the judge properly non-suited the plaintiffs.

2. As to the claim for money had and received, the defendants are not liable to an action for money deposited with them, or held by them as bankers, without a demand previous to suit.

3. As to special contract, the plaintiffs at the trial proved, at most, only a failure to present the checks in question for payment; and the proofs did not establish any contract of the defendants to present the checks in question for payment.

4. In the absence of any special contract or agreement, the contract implied by law upon the receipt by the defendants without compensation, at their place of business in Trenton, of a check upon persons in the city of New York, was that of transmitting the check in due season to a competent bank or other agent in the city of New York.

The opinion of the court was delivered by

THE CHANCELLOR.    The declaration in the Supreme Court, besides the common count for money had and received, contained special counts, which alleged that the defendants had received for collection from them, two checks of G. H. Levis, on Harney & Searles, bankers in New York, endorsed by B. W. Titus, and in consideration of the checks being so left with them, and of the plaintiffs having before kept and still intending to keep their account and deposits with the defendants, they undertook to collect these checks to present them for payment, and if not paid, to cause them to be duly protested, and due notice given to the drawer and endorser,

so as to hold them liable to the plaintiffs, and that they neglected to perform these promises.

There was evidence at the trial that one such check, dated August 23d, 1869, was left at the defendants' bank on the 24th of August, and credited as cash in the bank-book of the plaintiffs; that another, dated August 24th, 1869, was left at the bank on the 25th of August, 1869, and also credited in the bank-book as cash, in an amount including a check of West, Titus & Co., deposited with it, and that they were so credited to make good an overdraft of the plaintiffs on the defendants, and to enable them to draw further upon their account.

There was evidence that Levis had a credit with Harney & Searles on the 26th of August, 1869, to the amount of $985.23, and that he had collaterals with them besides, on which he would have been allowed to overdraw to the amount of $2000, and that on that day his drafts were paid to the amount of $1250, and thus to show that if the defendants had sent to New York on the next day, according to the usual course of business, the check deposited on the 24th, and presented it for payment, that it would have been paid; and that had the second check been so sent, it might have been paid in part. George H. Levis failed on the 25th or 26th of August, and after the 26th had no funds with Harney & Searles. These checks were not presented to Harney & Searles until September 3d. They were sent by the defendants to the Bank of the Commonwealth at New York, and there was evidence to show that Levis had made an arrangement with the runner and with the notary of that bank, for a gratutity paid them, not to present these checks at the office of Harney & Searles during banking hours, and that they were presented in the hall of their banking-house, to some man stationed there for that purpose, and that they were protested on the 27th, without actual presentment.

The defendants contend that they did not receive these checks as cash, or for collection, but only for transmission; that, if they received them as cash, there has been no sufficient demand, which is necessary to maintain a suit against a bank

for money deposited ; and that, if they received them for collection, they discharged their duty by transmitting them in the usual course of business to the bank in New York.

If these checks were received as cash, I think that there has been a sufficient demand of payment. The defendants, after they learned that these checks had not been paid, charged them back to the account of the plaintiffs, after which, one of the firm applied to the president and cashier of the bank to give the firm credit for the amount of the checks so charged, that they might draw against it. It is not necessary to demand money deposited with a bank by check, or to demand that it be handed over in bills or specie. The object of requiring a demand on banks before suit for deposits is, that when they are ready and willing to pay on demand, they shall not be annoyed by a suit. The implied contract is that the bank shall keep the deposit until called for ; and until the bank refuse to pay on demand, they are not in default. Here the plaintiffs demanded payment in the proper and usual way for that purpose. They required this money to be credited to their account, that they might draw for it. The officers of the bank, for reasons which they deemed sufficient, deliberately denied their obligation, and refused to comply. To send a check and have it protested, after this, would have been an absurd and useless form. The object of the rule was effected by this demand.

Then, if there was evidence from which the jury might infer that these checks were received as cash, the cause should have been submitted to them. I think there was such evidence. They were received and credited in a cash account as cash, in part as payment of an overdraft, and in part to be drawn against. They were received and credited in the same way as bills or notes of other banks. By such crediting, the bank became the owners of these bills, as they do of legal-tender notes or bank bills so deposited. And had the defendants failed the next day, the plaintiffs could not have demanded these identical checks as their property, left for collection, against a receiver or an assignee in bankruptcy ; the plaintiffs

had received the price of these checks by having it credited on their overdrafts, and by drawing for it. Any balance due to them from defendants, would be paid like other creditors' demands, *pro ratâ*, out of the *assets* of the insolvent. This distinction is familiar in bankruptcy courts, and in insolvent assignments. If there were anything in this case to have taken it from the usual rule, it should have been submitted, with these facts, to the jury, to determine whether the defendants took these checks as cash, or on deposit. Like bank bills, and all other paper, or even coin, taken in payment, or as cash, the payer is responsible, if they were worthless at the time they were received, or became so before they could be realized by ordinary diligence. In this case there is evidence to show that they could have been realized.

If the plaintiffs had endorsed these checks, it would have been necessary, in order to hold them liable, to have them presented for payment, and to have given notice of non-payment; they could not else have been held liable, if Levis had any funds with the drawers. This was necessary, too, to hold their endorser. If he was solvent, neglect of demand and notice to him would have discharged the plaintiffs, even if Levis had no funds. I think, therefore, that the cause should have been left to the jury to determine from the evidence whether these checks were taken as cash, and were, at the time, of value. There was at least, some evidence, even if it was not of the weight which I have given to it.

There are other questions upon the contract set out in the special counts. It is contended that the promise is without consideration; but the consideration set forth and proved, that the plaintiffs were dealers in the bank, and kept their deposits there, and gave these checks upon New York, by which the defendants had the advantage of the rate of exchange, or the greater value of funds in New York than at Trenton, is a sufficient consideration. It was so held in *Smedes* v. *City Bank*, 20 *Johns.* 372, and in the authorities cited to support that position in *Morse on Banking*. The question whether the defendants were bound by their under-

taking to do more than transmit them to some proper bank in New York, is a more serious and difficult one. If the checks had been sent for transmission only, their duty would have been discharged by sending them to a proper bank there for that purpose. It was so held by the Supreme Court of the United States in *The Bank of Washington* v. *Triplett*, 1 *Pet.* 25. That was the case of a note expressly left for transmission. The opinion of the court so states ; and the opinion goes no further than the case, and does not affect notes sent for collection. The doctrine of that case, as to notes sent for transmission, is admitted by both parties here; but there is a conflict of opinion in the courts of the different states, and the decisions in the English courts, as to the rule where a note or draft is left for collection. In England, in New York, and several other states, it is held that a bank receiving a note for collection, is responsible for the fault or neglect of its corresponding bank, or any other agent to whom it may transmit it for collection. This doctrine is expressly laid down by the Court of King's Bench, in *Van Wart* v. *Woolley*, 3 *Barn. & Cress.* 439 ; and by the House of Lords, in *Mackeroy* v. *Ramseys*, 9 *Cl. & Finn.* 818, and is indirectly acknowledged in *Prideaux* v. *Criddle*, 4 *Q. B.* (*L. R.*) 455.

In New York it was established as the rule by the Court of Errors, in *Allen* v. *The Merchants' Bank*, 22 *Wend.* 214 ; and followed by that court in *The Montgomery County Bank* v. *The Albany City Bank*, 3 *Seld.* 459 ; and *The Commercial Bank* v. *The Union Bank*, 1 *Kernan* 203 ; and by the Supreme Court in *Dormer* v. *The Madison County Bank*, 6 *Hill* 648, and is now universally acknowledged as the law in that state. The courts of Ohio, in *Reeves* v. *State Bank*, 8 *Ohio St. Rep.* 465 ; and of Indiana, in *Tyson* v. *State Bank*, 6 *Blackf.* 225 ; and *Abbot* v. *Smith*, 4 *Ind.* 452, have also adopted it. The opposite rule, that a bank receiving a note for collection, has fully discharged its duty by remitting the note to a proper correspondent, is held in Pennsylvania, in *Bellmire* v. *The Bank of the United States*, 4 *Whart.* 105 ; in *The Mechanics' Bank* v. *Earp*, 4 *Rawle* 384; and in many

other cases, which establish the rule that a note or bill payable in another place, simply left in a bank, is, by the custom, there left for transmission, and that this is the only duty of the bank; but in the last case, it was held that if the jury should find that the contract was to collect, the bank would be held liable for the neglect of its agent; and in *Wingate* v. *The Mechanics' Bank,* 10 *Barr* 104, the jury found that such was the contract, and the bank was held liable. Under the decision in Pennsylvania, it should have been left to the jury to find whether these checks were left for transmission or collection. The courts of Connecticut have adopted this rule. *East Haddam Bank* v. *Scovil,* 12 *Conn.* 303. So in Massachusetts. *Fabons* v. *Mercantile Bank,* 23 *Pick.* 330; *Dorchester Bank* v. *New England Bank,* 1 *Cush.* 177; *Warren Bank* v. *Suffolk Bank,* 10 *Cush.* 582; *Appleton Bank* v. *McGilvray et al.,* 4 *Gray* 518. It has also been adopted in Maryland, Mississippi, and Louisiana.

The decisions in Massachusetts, which our courts are accustomed to respect, are much weakened by the fact that in the first case, reliance was had upon the decision of the Supreme Court of New York, in *Allen* v. *The Merchants' Bank,* which was afterwards reversed in the Court of Errors (22 *Wend.* 243), and on the misapprehension that it was the opinion of the Supreme Court of the United States, in *The Bank of Washington* v. *Triplett.*

In this conflict of authorities, the weight of mere numbers ought not to govern. We should rather look for authority to those courts which usually decide upon principles acknowledged by the courts of this state, and by whose decisions we are accustomed to be guided. The courts of England are the sources from which we derive our legal maxims, and those of New York have adhered more closely to the rules of the common law which are our guide, than courts of other states. But this consideration alone is not sufficient to determine a question like this; we must look to the principles adopted by us which control it. One cardinal and well-established principle is, that every one shall be liable for the acts of his agents

chosen by himself. This, when applied to such a case, is founded in equity and good sense. A dealer who deposits a draft on a distant city, in a bank in his own town, has no choice of their agent or correspondent. It is the business of a bank to provide proper agents or correspondents for this service, when they adopt it, as most banks do, as part of their regular business. If they have no such correspondent, they should refuse to take paper for collection, and then the holder could choose whether he would leave it for transmission. He would then be led to inquire about the agent to whom it would be transmitted. The English and New York rule is much better adapted to the convenient dispatch of business. It is no hardship on the bank; it can always look to its correspondent bank to which transmission is made, for indemnification from its neglect.

It is also urged that this is the neglect of the notary—a public officer whom the bank was obliged to employ to protest the note. But here the main neglect is not in not protesting, which must be done, if necessary at all, by a notary, but in not presenting the checks to Harney & Searles for payment. That could have been done by any one, and, if presented, there is evidence to warrant the inference that one of them, at least, would have been paid. The services of a notary were only necessary in case of a refusal to pay. The check of the 23d was not handed to the notary until a quarter past three on the 26th, after business hours—perhaps in time for protest and notice, but too late to procure payment; had it been presented earlier, it might have been paid. These questions were for the jury, and it was error by a non-suit to withdraw the facts from them.

*For reversal*—THE CHANCELLOR, BEDLE, DALRIMPLE, DEPUE, SCUDDER, WOODHULL, KENNEDY, OLDEN.    8.

*For affirmance*—OGDEN.    1.