## SAMUEL HAZLETT v. COMMERCIAL N. BANK.

APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS NO. 2 OF PHILADELPHIA COUNTY.

Argued January 13, 1890—Decided February 3, 1890.

1. When a depositor transmits to a bank for credit his own check or draft upon a third bank, the bank receiving it becomes the depositor's agent for its collection, and the relation is not affected by the fact that the amount of the draft is at once credited to the depositor as cash.

2. If, in such case, the bank transmits the draft directly to the third bank on which it is drawn, and receives in return thereof the draft of the latter on a fourth bank, the transaction is irregular; for, as a collecting agent, the receiving bank has no right to accept anything from the bank upon which the draft is drawn but the money.

3. But if, on the receipt of such draft from the drawee bank, it is not paid

Statement of Facts.

on presentation, and the depositor, being informed of the facts, does not repudiate the draft so received, but directs it to be held for a few days, stating that the drawee bank is all right, and its draft will be paid in a day or two, he condones the irregularity and must himself bear the resulting loss.

Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, MC-COLLUM and MITCHELL, JJ.

No. 319 January Term 1889, Sup. Ct.; court below, No. 602 December Term 1885, C. P. No. 2.

On January 29, 1886, Samuel Hazlett brought assumpsit against the Commercial National Bank of Philadelphia.   Issue.

At the trial on November 19, 1888, it was shown that on Monday, May 19, 1884, the plaintiff, a banker at Washington, Pa., mailed to the defendant bank at Philadelphia, with which he had an account of two years' standing, his check or draft for $5,000, of that date, on the Penn Bank at Pittsburgh, Pa., drawn by himself to his own order and indorsed, to be placed to his credit.   The draft was received by the defendant bank on Tuesday, May 20th.   Credit was given to the plaintiff for $5,000 as cash, and the draft was transmitted by the defendant bank directly to the Penn Bank, Pittsburgh. The Penn Bank received the draft on the morning of May 21st, marked it "paid," charged the amount of it to the account of Mr. Hazlett in that bank, and forwarded to the defendant bank its own check or draft on the National Bank of the Republic, its Philadelphia correspondent.   About noon on May 21st, the Penn Bank suspended payment.   The check of that bank on its Philadelphia correspondent reached the defendant bank on May 22d, and on presentation payment was refused, when the defendant wired the plaintiff the same day: "We have received from Penn Bank, in return for your check, their draft on Bank of Republic, which is not good, which we hold subject to your orders."   On the same day, a letter was written to plaintiff, informing him of the telegram and stating: "Since this, we have received a telegram from a Pittsburgh bank that they will resume to-morrow (Friday) morning, which we hope will prove correct."   To the telegram, the plaintiff replied by letter the same day as follows: "Your telegram was duly received and contents noted.   The Penn Bank is all right; and their

draft, as mentioned, will be paid in a day or two.    Please hold for a few days and if not honored return it to me."    The draft of the Penn Bank, several times presented at the National Bank of the Republic, remained unpaid.    The Penn Bank opened for business on May 24th, and closed finally on May 26th. Other correspondence followed.    On June 2d, when the defendant's statement of account for May was received by plaintiff, showing that the Penn Bank draft was charged to the plaintiff, the latter wrote :  "When you first wrote me in relation to the draft you had received from the  Penn  Bank, in return for my check on them, I was under the impression that my draft had been returned unpaid; hence I wrote what I did. I therefore decline having anything to do with the draft in question."    The plaintiff subsequently brought this suit.

At the close of the testimony, the court, HARE, P. J., charged the jury as follows :

The plaintiff had a large account in the Penn Bank of Pittsburgh, having had on deposit there at least $50,000.    He also had an account with the Commercial National Bank of this city.    On Monday, May 19, 1884, he sent by mail to the Commercial N. Bank a check on the Penn Bank of Pittsburgh, for collection.    This was not a new thing.    Such a course of dealing, I believe, had been pursued for nearly two years ; and in nearly every instance, I believe in every instance, the Commercial N. Bank had collected those checks by sending them by mail to the Pittsburgh bank, and receiving in payment the checks of the Pittsburgh bank on other banks.    In this case the check, which was forwarded by the Commercial N. Bank on the 20th, reached the Pittsburgh bank on the morning of the 21st.    That bank was on the eve of failure, but still had it in its power to pay the check, if insisted upon.    In point of fact, what they did was to return through the mail another check on the Bank of the Republic of this city, to the order of the Commercial N. bank, following the same course which they had often taken previously.    Unfortunately, the Penn Bank of Pittsburgh, on which the check was drawn, and which had given its check in payment, was tottering and on the verge of failure, and in the course of the same day it failed.    It suspended payment, and, as the result shows, was hopelessly in-

Charge of Court below.

solvent.  As a consequence, the Bank of the Republic, on which the Penn Bank of Pittsburgh had drawn, refused to honor the check when it was presented to them on the succeeding day; that is, on the 22d.

It is contended that, owing to the failure of the plaintiff to present the check personally, or through an agent, to the bank at Pittsburgh on the morning of the 21st, while it was still solvent, the defendants are answerable.  [Whether the result would have been at all different if they had taken the other course, and had sent the check to the Fort Pitt bank of Pittsburgh and had it presented by them, instead of presenting it through the mail, is a question of fact which is by no means clear to my mind, because it might have been that the Penn Bank, which perhaps had its own reasons for not wanting to pay out any more money that morning than it could avoid, would, even if the check had been presented at the counter of that bank, have said, " We have always paid these drafts, as our books will show, by checks on Philadelphia on the Bank of the Republic, and we will pursue that course now, and will give you such a check."   Or, it might have been that the Fort Pitt bank would have put the check in the clearing-house for collection; in which case, as settlement would not have been made until the close of the day, and the Penn Bank would have failed before the day was out, they would have got nothing, neither the check nor anything in its place.] [1]

But, however that may be, I think that under the rule of law, [an agent who is intrusted with a check for collection upon a bank which is at the moment solvent, although it may become insolvent subsequently, and who, instead of presenting the check and demanding the money, thinks fit to take a draft upon any other bank, or any other person, becomes answerable if the principal chooses to hold him for the amount.] [2]  That is to say, [it is the right of the principal under such circumstances, to say, " You might have insisted on payment; you have chosen to take a draft; I do not know with certainty that you would have got the money, but it was your duty at least to ask for it, and if you had asked, presumably it would have been paid. You have deviated from the strict rule of business, and I will hold you answerable."] [3]  Such would be the case where a draft was presented, and a check taken therefor instead of

Charge of Court below.

money. It would be equally the case, if the bank should take stocks or anything else instead of money.

But, on the other hand, [where an agent has acted on behalf of his principal, and has gone outside of the strict letter of his instructions, meaning for the best, and taking a course which he had been pursuing previously, with no intentional negligence on his part, it is for the principal to say whether he will accept or decline.]⁴ [It is the duty of the agent to promptly inform his principal of what has been done, and then it is the duty of the principal to answer unequivocally whether he objects or assents. If the principal, upon being informed of what the agent has done outside of his authority, is silent; if, instead of saying, as he should say, to the agent promptly: "You have exceeded your instructions, or you have deviated from them, and consequently I hold you answerable, and this thing which you have taken for me I will not have,"—if he is silent, that is evidence of ratification or acquiescence.]⁵ You need not, however, consider that question here. I am merely stating it by way of illustration. Because in this case there was an answer.

[Information was communicated by the agent]⁶ promptly on the very day on which the true state of the case became apparent; that is, on the day following the day on which the bank at Pittsburgh had forwarded the check of the Bank of the Republic here. The defendants stated what they had done, and received an answer; and [the question is, whether that letter did not, taken in connection with the other circumstances, convey all the requisite information, and whether the reply was not a ratification or adoption of the act which is now challenged.]⁷ [The letter seems to me to be unequivocal.]⁸ It is in very few words: "We have received from the Penn Bank, in return for your check, their draft on the Bank of the Republic, which is not good, and which we hold subject to your order." In other words, [it informs the principal]⁹ that, instead of money, the defendants had got a check for money on another bank in this city, which check was not good, [but which they held for their principal.]¹⁰ That is to say, [it was for him to say what they should do.]¹¹ If, as has been contended, it was not a request for instructions, it was a statement that they held it [for the principal, and subject to his instructions.]¹² The plaintiff replied: "Your telegram is duly

Charge of Court below.

received and contents noted.  The Penn Bank is all right, and the draft will be paid in a day or two.  Please hold for a few days, and if not honored return it to me."

[It may in some cases seem hard that by ratifying what his agent had done outside of the line of business, the principal should bind himself as if it had been done within the line and ordered by him, but the reasons are these : In the first place, where a man is informed that something has been done which is not strictly within the line of his instructions, and does not dissent, but assents, it may be supposed that his assent was from some course of business which was well understood, and which he had no objection to.  It is evidence of that, though by no means conclusive.] [13]  [Moreover, if, when the principal is informed, he does not dissent, but approves, it may be taken for granted that in view of all the circumstances he holds it more to his advantage that the thing should stand than that it should be undone ; and if so, as he gets the benefit, he cannot escape if it turns out that the inconvenience preponderates, and repudiate what he has accepted.] [14]

[There may, perhaps, have been some reason why just at that moment the plaintiff did not desire that a peremptory demand for cash should be made on this Pittsburgh bank.  The Commercial N. Bank held a check drawn by the Penn Bank of Pittsburgh on the Bank of the Republic in this city, which had been dishonored.  It was in their power, by returning the draft and making a demand for the money, to put the Penn Bank in the position of a defaulter if it was not paid.  And what is more, when the Penn Bank a day or two afterwards endeavored to get upon its legs, and for a few days held its head above water, a demand for $5,000 would have been, perhaps, one of those straws which are said to break the camel's back.] [15]

[The plaintiff, whether from entire confidence in the Penn Bank, or from whatever other cause, was obviously indisposed to press the Penn Bank at that particular juncture.  He did not demand the $45,000 or $50,000 which he had in that bank when, after a short suspension, they again resumed payment for a few days, and it may be that he had reasons for not doing so.  But, be that as it may, his instruction to hold the draft seems to me to be an instruction not to present it to the bank again and insist upon payment.] [16]

### Charge of Court below.

There is another aspect of the case. [Had the plaintiff written at once that his orders had been violated, and that the defendants however innocently, had mistaken their duty as agents, it would have been their right to protect themselves. They would then have taken this check or sent it to Pittsburgh, and on the Friday afternoon that the Penn Bank resumed payment, or on the Saturday, or the following Monday, while they continued to pay all dishonored drafts presented, they would have got their money. The moment the plaintiff said, " I disavow this check; you must do the best you can with it; " or, " You may hold it, but you must answer to me for the $5,000," it would have been clearly the duty of the Commercial N. Bank to take a course that would protect its stockholders. But, the assurance that the Penn Bank would probably be all right in a few days, would naturally be understood as conveying the idea that the plaintiff did not wish the defendant to pursue such a course.] [17]

[If you find that the plaintiff distinctly understood that the defendant had received a draft from the Penn Bank in payment of the plaintiff's draft, and that the defendant, instead of getting money had got a check, which was dishonored; that it was in his power to declare that he would have nothing to do with the check or accept it as his own; and that he directed them to hold the check as his, and as if he had originally authorized them to take it, you should find a verdict for the defendant.] [18] If you find the other way, namely, that they did not inform him, and he did not so reply, then your verdict should be for the plaintiff.

A juror: In case the check had gone through the clearing-house and had been dishonored, would it have been honored if the bank resumed?

By the court: I am inclined to think it would have been honored when the bank resumed.

Mr. Johnson: The jury also wish to know whether it was our duty, under the letters which passed, to send the draft on the Bank of the Republic out to Pittsburgh to be collected, instead of coming to the Bank of the Republic as was actually done.

By the court: [It was the duty of the defendants to present the check to the Bank of the Republic, which they did. When

it was not honored, it was their duty to inform their principal and hear what he would say, which they did. When he replied, it was their duty to follow his instructions. If he told them to hold it, they complied with his instructions in not sending it to Pittsburgh.] [19]

The jury returned a verdict in favor of the defendant. Judgment having been entered, the plaintiff took this appeal, specifying that the court erred:

1. In not directing a verdict for the plaintiff.

2. In submitting any question of fact to the jury.

3. In submitting to the jury the construction of the plaintiff's letter of May 22, 1884.

4–19. In the portions of the charge embraced in [ ] [4 to 19]

*Mr. A. Sidney Biddle* (with him *Mr. J. Rodman Paul*, *Mr. Geo. W. Biddle* and *Mr. Henry G. Ward*), for the appellant.

Counsel cited: 2 Morse on Banks and Banking, 3d ed., § 573; Congie v. Hadley, 99 N. Y. 133; Louis v. Johnson, 27 Fed. R. 243; Fifth N. Bank v. Ashworth, 123 Pa. 212; Merchants N. Bank v. Goodman, 109 Pa. 422.

*Mr. John G. Johnson* (with him *Mr. James W. Paul*), for the appellee.

OPINION, MR. CHIEF JUSTICE PAXSON:

When the plaintiff drew his check for $5,000 on the Penn Bank of Pittsburgh, and deposited said check with the Commercial National Bank of Philadelphia for collection, he made the latter bank his agent. The mere fact that the collecting bank credited him with the check as cash did not alter that relation. This is done daily,—indeed, it is the almost universal usage to credit such collections as cash, unless the customer making such deposit is in weak credit. If the check is unpaid, it is charged off again, and the unpaid check returned to the depositor.

The receipt of a check for collection involves the duty of due diligence on the part of the collecting bank. If the money is lost through its neglect, it becomes fixed for the money. This is familiar law. The defendant bank, instead

Opinion of the Court.

of sending the check to an agent in Pittsburgh for collection, sent it direct to the Penn Bank, and received by return mail the check of that bank on the National Bank of the Republic, its Philadelphia correspondent.   This was irregular.   As a collecting agent, it had no right to receive anything from the Penn Bank but the money.   A check or draft on another bank is not payment.   If the money had been lost, for this reason, without more, the defendant bank would have been liable, and would have had no right to charge off the check against the plaintiff.   It appears probable, however, that the check might still have been collected, if due diligence had been used.

The Penn Bank suspended about noon on May 21, 1884; it re-opened on Saturday, May 24, about 2 P. M., and remained open until noon on Monday, May 26th.   During this re-opening all checks that were presented were paid.   The check of the Penn Bank reached Philadelphia on May 22d, and was presented to the National Bank of the Republic.   Payment was refused then, as well as on several subsequent days.   On May 22d, the defendant bank wired the plaintiff: "We have received from Penn Bank, in return for your check, their draft on Bank of Republic, which is not good, which we hold subject to your orders."   The plaintiff had then a right to re-pudiate what the defendant bank had done, and hold it for the money.   He did not do so.   On the contrary, he wired the bank as follows: "Your telegram was duly received, and con-tents noted.   The Penn Bank is all right; and their draft, as mentioned, will be paid in a day or two.   Please hold for a few days, and, if not honored, return it to me."   It must be borne in mind that when the plaintiff sent this telegram, he was in possession of all the facts, and knew far more about the Penn Bank than did the collecting bank in Philadelphia. With this information, he directed the draft on Philadelphia to be held for a few days.   He cannot now complain of the delay.   It was his own act, and condoned the original negli-gence.   Moreover, it is a conclusive answer to the allegation that the defendant bank was no longer his agent.   The tele-gram was an order from a principal to his agent, or it was a piece of impertinence.

We find no error in the rulings of the court below.

Judgment affirmed.