# Union Trust Company of Donora v. National Indemnity Company

48

*D. M. Anderson* and *J. R. McCreight*, for plaintiff.

*Donald Thompson* and *Donnan & Miller*, for defendant.

BROWNSON, P. J., December 15, 1934. — The claims made under this classification are for losses alleged to have been suffered in consequence of the issuing by Joseph Mendola to depositors of the Bank of Donora & Trust Company of pass books of the Union Trust Company of Donora, crediting such depositors, inter alia, with the amounts of certain deposits, made by them with the former, which the latter had not assumed and agreed to pay. . . .

The plaintiff's position, with respect to these transactions, is that Mendola's acts were dishonest, and had the effect of imposing upon it, without its knowledge and without its consent, liabilities which by the agreement with the Donora bank it had not undertaken to assume.

The defendant takes the positions: (*a*) That the issuing of these pass books by Mendola was not dishonest, because the persons to whom they were issued had actually deposited with the Donora bank the amounts entered therein; (*b*) that even if the pass books issued by Mendola could be regarded in the light of a promise made in plaintiff's name binding it to pay the amounts credited therein, no loss has resulted therefrom to the plaintiff, because, having taken over all the Donora bank's assets, it was already liable for all the debts of the latter; and (*c*) that no loss has resulted, because Mendola's act in undertaking to bind the plaintiff to pay deposits in the Donora bank which the plaintiff had not assumed, was unauthorized and not binding on the plaintiff, and did not place it under an obligation to pay the same. . . .

2. The transaction between the two institutions consisted of the following elements: (*a*) The giving to the plaintiff by the Donora bank of a note for $1,317,116.26 (which was the aggregate amount of the latter's indebtedness as shown by its books) and an absolute and unconditional engagement by the plaintiff to pay those debts; (*b*) the sale, outright, to the plaintiff of certain real estate, at the price of $141,500, which sum was to be credited upon this note; (*c*) the pledge with this note, as collateral security therefor, of Donora bank's other assets, with authority to liquidate the same and apply the proceeds thereof to the discharge of the note; and (*d*) a provision that if the pledged assets should prove more than sufficient to satisfy the note, the surplus should be returned to the Donora bank, but if they should

prove insufficient, the plaintiff should have legal remedies to collect the amount of the deficiency.

An arrangement such as this cannot be construed to amount to a voluntary assignment for the benefit of creditors when the undertaking and obligation to pay creditors is absolute and not dependent upon the disposition of the transferred property and the amount of money realized therefrom: 12 R. C. L. 587, sec. 103; Miller v. Shriver, 197 Pa. 191, 195. In the cases such as Love v. Clayton et al., 287 Pa. 205, which have held transfers to amount to assignments for the benefit of creditors, the obligation of the transferee has been to pay to creditors only the proceeds of the property turned over by the debtor when converted into money. Here, there was an absolute and unqualified assumption and undertaking to pay debts of the Donora company to the amount of $1,317,116.26, this being represented and guaranteed to be the whole of its indebtedness.

When, however, the transfer is of the whole of the debtor's property, the transferee may under some circumstances become liable to creditors other than those the payment of whose claims has been expressly assumed; but the mere circumstance that payment of all creditors may not be provided for will not of itself render the transfer fraudulent, nor render the transferee accountable for debts not preferred, if the transfer be for a full consideration and bona fide, honest and without an intent to hinder or delay creditors: The York County Bank v. Carter, 38 Pa. 446; Lake Shore Banking Co. et al. v. Fuller, 110 Pa. 156, 163; Miller v. Shriver, 197 Pa. 191, 195. There was in this instance no such intent. It was believed by both parties, upon the best evidence that was obtainable, viz., the accounts found in the books of the Donora bank, that the amount of indebtedness which the plaintiff was asked to and did assume and undertake to pay constituted the Donora bank's entire indebtedness. Under these circumstances,

the utmost for which the plaintiff could be held account-able to creditors (beyond its promise to pay) would be the excess, if any, in the value of the transferred assets over and above the sum which it explicitly agreed to pay to creditors: 12 R. C. L. 582-583, sec. 100; idem 641-642, sec. 148. In this case the uncontradicted evidence shows that, taking into account the proceeds realized from the pledged assets insofar as these have been liquidated and converted into money for application upon the note as provided for in the agreement, and taking all yet unconverted assets at full face value, the total of the assets pledged to the plaintiff to secure the note given and to reimburse it for the payment of the debts assumed, have fallen short of being sufficient to meet the note by considerably more than $100,000. I therefore find that it has not been shown that there was any excess in the value of the assets turned over to the plaintiff above the consideration paid by it, viz., the payment of the scheduled indebtedness amounting to $1,317,116.26, and that, on the contrary, the plaintiff, by assuming the payment of that amount of indebtedness, gave for the transfer a consideration that was in excess of the assets transferred.

The defendant, however, takes the position that, the Donora bank being a corporation, the applicable rule is different from that which would apply if the transfer of assets were made by an individual; that when a corporation, in the event of insolvency or impending insolvency, transfers all its assets to another, without making provision for and causing to be paid all its indebtedness, the transaction having the effect of terminating its business, the creditors unprovided for will have an equitable lien for their claims upon the transferred assets in the hands of the transferee, pro rata with the creditors whose claims the transferee has assumed to pay. In support of this position defendant cites Williams v. Commercial National Bank, 49 Or. 492, 90 Pac. 1012, and

91 Pac. 443; Modoc County Bank v. Ringling et al., 7 F. (2d) 535; and Erhard v. Boone State Bank, of Boone, Iowa, et al., 65 F. (2d) 48. Each of those cases had in it one or more elements not present here. Thus in Williams v. National Bank the court found that the transferee was not an innocent purchaser in good faith; in Modoc County Bank v. Ringling et al., certain statutes of the State of California figured; and in Erhard v. Boone State Bank, of Boone, Iowa, et al., it was held that the transferee bank was upon notice or inquiry respecting the fraudulent cancellation, by an officer of the transferor bank, of the account of the plaintiff which thereupon was omitted from the list of claims to be assumed by the transferee. Moreover, in the present case the deposit claims not exhibited by the Donora bank's books, and not assumed by the plaintiff, were not left without recourse to any source of payment other than the transferred assets, because those depositors could resort to the statutory liability of the Donora bank's stockholders, imposed by section 5 of the Act of May 13, 1876, P. L. 161.

However, defendant relies upon a statement at page 498 in the Williams case, supra, quoting 10 Cyc. 1267, which seems to lay down as a general rule the following:

" 'Where one corporation transfers all its assets to another corporation, and thus practically ceases to exist, without having paid its debts, the purchasing corporation takes the property subject to an equitable lien or charge in favor of the creditors of the selling corporation. This is a necessary extension of the doctrine that the assets of a corporation are a trust fund for its creditors. Such being the quality which equity annexes to them, when the corporation elects to go out of existence, to dispossess itself of them, and to transfer [them] to another corporation, equity follows the trust fund into the hands of the new taker, and charges the property in

the hands of such taker with the debts of the transferrer.' "

The quotation, as made in the Williams case, omits some qualifying language by which the quoted passage is followed in 10 Cyc. 1268, viz.:

"The principle has no application to a sale made in the usual course of business; nor does it apply in a case of a sale for a full consideration, albeit of the entire property of the selling corporation, to another; and it has been held that if the consideration for the sale is the assumption and payment by the purchasing company of the mortgage debts of the selling company, to the full value of all the property conveyed, the sale will not be set aside in favor of other unsecured creditors of the selling company, nor will they have a lien on the property for which full value has been paid in good faith."

In the quotation from Cyc., the rule as stated is said to result from the doctrine that a corporation's assets are a trust fund for its creditors. That trust fund doctrine, to the effect, as stated in earlier cases, that the capital of a corporation is a trust fund for the payment of its creditors (which, as the capital is ordinarily represented by assets in which it is invested, was applied to such assets), has been explained, or it may be said modified, by later authorities so as to be very much narrowed in its scope.

In Fogg v. Blair, 133 U. S. 534, it was held that this doctrine means only that the property must first be appropriated to the payment of the debts of the company before any portion of it can be distributed to the stockholders; that a doctrine that the property is so affected by the indebtedness of the company that it cannot be sold, transferred or mortgaged to bona fide purchasers for a valuable consideration, except subject to the liability of being appropriated to pay that indebtedness, has no existence. In that case the entire property was transferred to another company.

In Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371, 385-386, Mr. Justice Brewer, after reviewing certain cases, said:

"These cases negative the idea of any direct trust or lien attaching to the property of a corporation in favor of its creditors, and at the same time are entirely consistent with those cases in which the assets of a corporation are spoken of as a trust fund, using the term in the sense that we have said it was used.

"The same idea of equitable lien and trust exists to some extent in the case of partnership property. . . . Yet, all that is meant by such expressions is the existence of an equitable right which will be enforced whenever a court of equity, at the instance of a proper party and in a proper proceeding, has taken possession of the assets. . . .

"A party may deal with a corporation in respect to its property in the same manner as with an individual owner, and with no greater danger of being held to have received into his possession property burdened with a trust or lien. The officers of a corporation act in a fiduciary capacity in respect to its property in their hands, and may be called to an account for fraud or sometimes even mere mismanagement in respect thereto; but as between itself and its creditors the corporation is simply a debtor, and does not hold its property in trust, or subject to a lien in their favor, in any other sense than does an individual debtor." To the same effect is 7 R. C. L. 198, sec. 169.

In 3 R. C. L. Perm. Supp. 1932, the case of Spencer v. Anderson et al., 193 Cal. 1, is quoted as saying that the trust fund doctrine has been generally rejected in the later decisions, and that whether that doctrine still obtains or not, it is not to be regarded as modifying or adding to the established rules of equity jurisprudence for relief of creditors upon the ground of fraud.

Liability of the transferee for debts of the transferror,

"is not necessarily incident upon every transfer of all, or substantially all, of the assets of one corporation to another. Where there is a mere sale for an adequate price, without fraud or attempt to hinder, delay, or defraud creditors, the purchaser is not liable for claims against the seller": Note in 15 A. L. R. 1118.

In short, the effect of the later authorities appears to be that equitable lien is not the ground and foundation upon which, in some instances, relief is granted to creditors whose claims are left unpaid; it is merely an instrumentality by means of which relief is given upon the ground that the transfer of assets is an actual or constructive fraud upon the creditors. So, then, we have in each case to come down to the question whether the transfer made therein was an actual or constructive fraud upon creditors.

In some States there are statutes prohibiting transfers by corporations of all their property: 14A C. J. 886, 893, secs. 3065, 3070; or statutes prohibiting their giving preferences to creditors: 14A C. J. 910, sec. 3092. But in the absence of such statutes, "the consideration for the transfer may consist either wholly [as in certain cases cited] . . . or in part [as in other cases cited] . . . of the agreement of the transferee to pay certain debts, where the value of the property transferred does not exceed the amount of the consideration.

"So, in jurisdictions in which corporations are permitted to prefer creditors, a successor corporation is not liable where it pays full value for the property transferred to it by the old corporation by undertaking to pay certain debts of the old corporation, though the arrangement may result in a preference of creditors": Note in 15 A. L. R. 1120.

Under the law of Pennsylvania, "a corporation, as well as an individual or copartnership, may prefer one creditor to another if the preference is honestly made to secure or satisfy a bona fide debt": Moller et al. v. Key-

stone Fibre Co. et al., 187 Pa. 553, 563. In a case in which a corporation, unable to continue operations by reason of insolvency, transferred all its property, Strong, J., said: "If the sale was in fact made to procure the means of paying debts; if it was for a fair price, and especially if its proceeds, whether money or notes, were applied to the payment or security of debts, other creditors could not avoid it": Ashhurst's Appeal, 60 Pa. 290, 313. "A strictly private corporation, owing no peculiar duties to the public, unless prevented by statute, has the same dominion over its property as an individual: [And banking corporations chartered under the Act of May 13, 1876, are within this rule: Maxler v. Freeport Bank et al., 275 Pa. 510]. . . . Creditors cannot deny to a corporation the right generally to sell its assets. Where the sale of corporate assets creates a preference [unlawfully], or is made with intent to defraud creditors, their rights are safeguarded in law": Kephart, J., in Halpern v. Grabosky, 296 Pa. 108, 112.

Of course, if a corporation transfers its property to another corporation substantially owned and controlled by the former's stockholders, the transferee will hold subject to the claims of nonassenting creditors, because in such case there is no substantial change in the real ownership: Delphia Knitting Mills Co., Inc., v. Richards, 62 Pa. Superior Ct. 9, 12; Atlas Portland Cement Co. v. American Brick & Clay Co. et al., 280 Pa. 449, 456; Summit Hosiery Co. v. Gottschall, 292 Pa. 464, 468; The Pennsylvania Knitting Mills of Reading v. Bibb Mfg. Co., 12 Pa. Superior Ct. 346; Montgomery Web Co. v. Dienelt et al., 133 Pa. 585. But when this is not the case, and there is no fraud, the rule is different: Art Society of Pittsburgh v. Leader Publishing Co., 60 Pa. Superior Ct. 548.

The facts in the present case are that the Donora bank and the plaintiff were entirely independent concerns; that there was no fraudulent purpose in the transaction

that occurred between them; and that the transfer of assets to the plaintiff was for a valuable consideration that has been proved to be fully adequate.

3. The controversy with respect to classification no. 1 appears then to come down to the third of the positions taken by the defendant, viz., that Mendola's act in issuing these pass books did not have the legal operation and effect of imposing a loss upon the plaintiff; that the plaintiff could have defended successfully against the payment of the deposit credits entered in the pass books, to the extent that these were in excess of the sums which by its contract it had agreed to assume, and that if it has since paid in accordance with Mendola's pass book entries, it did so voluntarily.

The plaintiff takes the position and contends that the entries made by Mendola in the pass books, crediting therein certain sums, as and for deposits "transferred from Bank of Donora and Trust Company", created a binding contract of the plaintiff to pay to the depositor the full amounts of money so entered, against which contract it had no defense.

The purport and meaning of these entries was that the plaintiff had assumed and undertaken to be responsible for, and to pay in the regular course of business, deposits, to the extent of the sums specified in the entries, that had previously been made in the Donora bank; and these entries were thus, in point of fact, untrue and false entries to the extent to which the sums specified therein exceeded the amounts which actually had been assumed. The plaintiff, by its written contract with the Donora bank, had agreed to take over, and assume the payment of, only such deposits, and in such sums, as the Donora bank's ledger showed to be owing by it to its depositors, and these were the amounts which had been entered in plaintiff's ledger as so assumed. The very basis of the claims advanced by plaintiff under this classification is that these entries were not in accordance with the facts.

No citation of authorities would be required to show that Mendola, as a subordinate and clerical employe of the plaintiff, had no authority to alter a contract which its board of directors had formally and solemnly entered into in writing, nor to determine, for the board of directors, whether the "privilege", specified in the written contract, of assuming any additional liabilities and looking to the Donora bank's equity, if any, in its transferred assets, and to its stockholders, for reimbursement, should be exercised. Sometimes, however, banks may become estopped from questioning, as against persons with whom their employes have dealt, the authority of the latter to do certain acts in the course of such dealings, and it therefore becomes necessary to consider whether there was anything in or connected with these transactions which would have estopped the plaintiff from making a defense against the payment of the sums entered in the pass books by Mendola, to the extent that such entries were false.

"Formerly entries in a pass-book were regarded in a more technical manner than they are to-day. Once, an entry made by a bank officer at the time of receiving a deposit was deemed original and binding on the bank, but not on the depositor; and on neither when the entry was made afterward by copying from the ledger. The modern law has swept away all this refining. The rights of neither party are absolutely fixed by the entries, and they are always 'open to examination and correction,' [citing 89 Mo. App. 500; 36 Minn. 193; 53 Kan. 480]. Prima facie they are correct, but not conclusive, [citing cases including Mechanics Bank v. Earp, 4 Rawle, 384]. Consequently, a depositor who proves that an entry is incorrect can recover the amount not credited to him. Nor will a by-law or rule of the bank, declaring that all payments must be examined at the time, prevent a depositor from showing afterward that there was a mistake in his account of deposits and receipts.

"A bank is not required to notify a depositor of an error in entering a deposit; how its silence must be regarded depends on circumstances. On the other hand, a depositor's silence is an admission of the correctness of entries until action is taken to overcome them": 1 Bolles, Modern Law of Banking, 467, 468.

In 1 Morse on Banks and Banking (6th ed.), sec. 291(*b*), it is said:

"But the entry [in the pass book] of credit for a deposit is held to be an original entry only on the supposition that, as in the ordinary course of business above described, the book accompanied the deposit, and the entry was made by the teller simultaneously with the receipt of the money, and as part of the same transaction. For if the book was sent to be written up afterwards from the books or memoranda in possession of the bank, the entries are not original, and may be examined into. But the entry of the credit is, after all, only a receipt. It is *prima facie* evidence against the bank, and binds it like any other form of acknowledgment or receipt. But apparently it binds no more; and as a receipt it is open to explanation by evidence *aliunde*. So that, if the bank succeeds in showing clearly that the entry is a mistake, it will no longer be binding."

"All book crediting by a bank without corresponding funds to pay them is mere jugglery, and binds nobody": 2 Bolles, Modern Law of Banking, 625.

There are, of course, some exceptions to these rules: Where the bank has been guilty of some negligence which, if it were allowed to defend, would operate to the depositor's prejudice, subjecting him to detriment and loss, the bank may be estopped from denying that the pass-book entry represents an actual liability: Rapp et al. v. National Security Bank, 136 Pa. 426; Peterson v. The Union National Bank, 52 Pa. 206; Girard Trust Co. v. Boyd, 45 Pa. Superior Ct. 285. But in the absence of any circumstances to raise such an estoppel, the rules

laid down in the textbooks above-cited appear to prevail, and the general course of the Pennsylvania authorities is in harmony therewith: Rapp et al. v. National Security Bank, supra; Peterson v. The Union National Bank, supra; Girard Trust Co. v. Boyd, supra; The Dimes Savings Institution v. The Allentown Bank, 65 Pa. 116; Hazlett v. Commercial National Bank, 132 Pa. 118; Wetherill v. The Bank of Pennsylvania, 1 Miles 399 (dictum); The Mechanics Bank, etc., v. Earp, 4 Rawle 384, 388.

The pass book entries themselves, by their own inherent force and operation, and on their face alone, would not in this case estop the plaintiff to deny that it had become indebted to the depositors for the respective amounts of these undisclosed Donora bank deposits. When, upon receiving a deposit, a teller enters it in the pass book, it is the actual receipt of the money that gives rise to an indebtedness on the part of the bank, and the entry in the book is merely evidence thereof; as authorities that have been cited say, it is an acknowledgment of the fact that money has been received for deposit, and amounts to a receipt therefor; and like a receipt it is only prima facie evidence of the fact stated, and not conclusive. Such statement may by either party be shown to be incorrect: the depositor may show that the actual amount deposited is greater, or the bank may show that it is less, than the sum specified in the entry.

These false entries were, therefore, not binding and conclusive upon the plaintiff, unless there were something outside of the entries themselves to estop the plaintiff from questioning their truth.

We are unable to find anything of that kind in the evidence. The entries did not represent moneys received at the time by the plaintiff from the depositors, and were, as we have seen, merely statements, untrue in part, that the plaintiff had assumed liability for certain deposits as having been made with the Donora bank; and these

entries were made a month or more after the plaintiff had taken over and assumed such of the Donora bank deposits as it had by contract agreed to assume. It received no consideration for such additional assumption as Mendola undertook to evidence by these pass book entries: if the assets it received from the Donora bank should prove to be more than sufficient to reimburse it for paying the liabilities which were assumed in the written contract, it was by that contract bound to return such surplus to the Donora bank unless it should elect to assume additional liabilities and charge them against the same, and it never did so elect. As already pointed out, Mendola had no right to elect for it. Moreover, in point of fact there was no such surplus. Nor is there either proof or allegation that, between the dates of these entries and the discovery of Mendola's misdeeds, the depositors had in any way altered their positions in reliance upon these entries, or had done any acts on the faith thereof, or that anything had occurred to cause detriment to them as the result of or in connection with these entries. There is thus in the case no element of estoppel to forbid the plaintiff to assert the truth.

Accordingly, if none of the plaintiff's money had been paid out in pursuance of these false entries before the plaintiff discovered the facts, and it was then not estopped from asserting and showing the falsity of these entries, no loss had then resulted to it from them. An incorrect entry not resulting in a loss of money does not give rise to a claim upon the bond: the act which was a breach of duty must be followed by a money loss in order to make the surety liable: Commonwealth, to use, v. Strickler et al., 178 Pa. 148. And, as is correctly stated in plaintiff's brief, these entries would result in a loss only if, as the result of them, the money left the bank, passing out of plaintiff's possession. We agree that if, while in plaintiff's employ, Mendola had, without its assent, paid to depositors out of the bank's funds any of

the moneys represented by these false entries, losses would thereby occur for which the defendant would be responsible on the bond, notwithstanding the fact that the amounts so paid would be debts of the Donora bank for which its stockholders were liable under the Act of May 13, 1876, P. L. 161, because the plaintiff would not be bound to forego suing on the bond and pursue those stockholders; but defendant, after making payment in accordance with the bond, would be entitled to be subrogated to the statutory right of action against stockholders. But it has not been shown, nor even asserted, that in the case of any of the accounts listed in classification no. 1 Mendola did this. The testimony indicates, however, that to at least some of these depositors such moneys have been paid by the plaintiff since, upon the discovery of his wrongdoing, Mendola was discharged from its employ. But if the plaintiff then decided, instead of defending against any claims of depositors by showing the falsity of the entries, to pay them off without contest, such voluntary payments would not create "losses" within the meaning of the bond; this, both under the principle of the maxim volenti non fit injuria, and because such voluntary payment would operate, for the benefit of the surety, as an adoption and ratification of Mendola's acts. It is only for losses involuntarily suffered as the result of dishonest or criminal action of the employe that the bond obligates the surety to make reimbursement. If the plaintiff made payment voluntarily, its only claims for reimbursement would be against the Donora bank stockholders, under the clause of the contract between the banks which authorized plaintiff to sue for the amount of any indebtedness, over and above that assumed in the contract, which plaintiff might afterwards choose to pay voluntarily.

In the authorities that have been cited on the subject of untrue pass book entries, it was generally the fact that the falsity of the entry was the result of honest mis-

take. In the present case the erroneous entries were made knowingly and intentionally by Mendola, with a view to preventing the depositor from discovering, and preventing the plaintiff and the Donora bank from learning, that he had misappropriated the moneys in question. But this circumstance does not appear to us to take the case out of the doctrine laid down in the authorities cited. It is true that banks have been often held to be chargeable with the consequences of frauds which their officers and employes have committed, while transacting business with customers, to the detriment of the latter, even although the fraudulent acts were not directed nor authorized by the bank: Steckel et al. v. The First National Bank, 93 Pa. 376; Ziegler v. The First National Bank of Allentown, 93 Pa. 393. This would seem to be based, in instances where the fruits of the fraud have not accrued to the bank, upon the principle that when one of two innocent persons must suffer, the party who placed the perpetrator of the fraud in a position which enabled him to commit it, cannot cast the resulting loss upon the other party.

But in all the cases in which banks have been held bound by the fraud of their employe, the fraud was directed against the third party, while here the only one of the parties upon whom Mendola was committing fraud was the plaintiff. As to the depositors, his frauds operated, not against them, but in their favor, because he was giving them something they were not entitled to—an untrue acknowledgment that the payment of certain moneys to them had been assumed by his employer. In such case the fraud committed by an unfaithful officer against his employer can be undone, because the undoing of it will not deprive the other party of anything that he has a legal or moral right to retain.

The effect of the plaintiff's questioning its liability for the full amounts of these entries would not, however, be to leave the depositors high and dry with respect to the

portions of their deposits with the Donora bank which the plaintiff did not by its contract assume: as to these, they would stand precisely as they stood immediately before the entries were made, i. e., as having claims therefor against the Donora bank with the right to use the statutory liability of its stockholders as the means of collection.

Plaintiff argues, however, that Mendola took from these depositors their Donora pass books, and afterwards destroyed them, thereby depriving them of the means of establishing their claims against the Donora bank, and that this should be regarded as rendering the plaintiff responsible for the moneys improperly credited to those depositors.

Passing over any question as to whether, if Mendola did destroy the Donora bank pass books of the persons named in connection with the 10 claims presented under classification no. 1, this could as matter of law have the effect ascribed to it (that is to say, whether if he did commit the tort, not authorized by the plaintiff, of wrongfully destroying evidence which these persons had against the Donora bank, the law would hold the plaintiff liable for such tort), we may remark that there is perhaps possible room for some question as to whether the fact that Mendola wrongfully destroyed these particular books unequivocally appears. At the trial Mendola said: "In most cases . . . when the customer did not want the old pass book, I lifted it"; and later he testified that he destroyed "most" of the books which he had so taken up; but he also said that he was unable to remember and say in what particular instances, when he was issuing new pass books, the old ones were turned over to him. He issued hundreds of books to Donora bank depositors, and, as he expressed it, "the cases were so numerous, I couldn't truthfully say in any particular case." The depositors themselves were not called as witnesses, and Mendola was the only person who testified on the subject. Upon

his testimony above-quoted, it would be quite uncertain whether the 10 pass books that are connected with the claims made under classification no. 1, were among those which the customers did not wish to keep, and which Mendola kept and afterwards destroyed. But it was stipulated of record, in connection with the claims in classification no. 1, that Mendola, if recalled, would testify, inter alia, "that the old pass books have since been lost or destroyed." This stipulation does not explicitly say that these books have been lost or destroyed by Mendola; but if we assume that it was intended to mean this, and that these books were wrongfully and tortiously either "lost or destroyed" by him, then even if, as a matter of law, the plaintiff would be liable for a tort so committed by him, such liability could not extend to making the plaintiff liable for the amount of deposits with the Donora bank, unless by such tort the depositors were rendered unable to establish the making of the deposits with the Donora bank. But that they were so rendered unable to prove those deposits, does not necessarily follow from a destruction or loss of the pass books, if such took place. Indeed, in the present case the plaintiff has been so free from any difficulty in showing the facts with respect to the making, and Mendola's misappropriations of, those deposits, that those facts have been undisputed. We cannot find it to have been shown that, by anything that Mendola may have done, these depositors were prevented from establishing claims against the Donora bank.

The general and final conclusion we reach regarding classification no. 1, is that the claims embraced therein cannot be allowed, because it has not been shown that losses of the sums claimed have been suffered by the plaintiff involuntarily as the result of breaches by Mendola of the bond sued on.